UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT C. JIMENEZ,

    Plaintiff,

    v.

MEDICAL HEALTH SERVICES; et al.,

    Defendants.
                                        /

No. C 09-2328 SI (pr)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this action, Robert C. Jimenez complains about the medical care he received for hepatitis C while incarcerated at Pelican Bay State Prison. For the reasons discussed below, defendants' motion for summary judgment will be granted and judgment will be entered against plaintiff.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

Jimenez was an inmate at Pelican Bay State Prison at the relevant time. He was transferred to that facility in June 2008, and remains there.

Defendants were health care providers on the staff at Pelican Bay. Defendant Dr. Sayre was the chief medical officer at Pelican Bay. Defendant Dr. Rowe was a staff physician. Defendant Risenhoover was a family nurse practitioner.

The California Department of Corrections and Rehabilitation ("CDCR") has a protocol

for the treatment of inmates with hepatitis C. The hepatitis C protocol in effect at Pelican Bay from May 2004 - February 2010 required inmate-patients with genotype 1, 4, or 6 who received anti-viral combination therapy to be tested after the first three months of therapy to determine their response to the therapy. Objective criteria were set up to determine whether an inmate was responding to the therapy. The protocol stated:

> Inmate-patients with genotype 1, 4 or 6 who are receiving combination therapy shall have a quantitative PCR test performed after the first three (3) months of therapy to determine response. Those who achieve more than a 2-log reduction in viral titer at 3 months are considered "responders." Those whose viral titer at three (3) months remains within two (2) logs of the pre-treatment value are considered "non-responders." Inmate-patients with genotype 1, 4 or 6 who are non-responders at three (3) months shall have combination therapy discontinued. [¶] Assuming treatment is well-tolerated . . . inmate-patients with genotype 1, 4 or 6 who are responders to combination therapy at 3 months shall continue therapy for an additional nine (9) months to complete a total of twelve (12) months.

Sayre Decl. Ex. B, p. 4, ¶¶ 18-19.[1] Repeat tests were to be performed for genotypes 1, 4 and 6 under the protocol.

According to the protocol, the side effects of the therapy can be severe. The potential side effects for interferon and/or ribavirin therapy listed in the protocol include flu-like symptoms; gastrointestinal symptoms (including loss of appetite, nausea, vomiting, diarrhea, heartburn and indigestion); psychiatric symptoms (including depression, insomnia, anxiety and irritability); respiratory problems (including cough and shortness of breath); skin disorders; and blood element problems (including reduced number of white blood cells, reduction in platelets, and anemia). *See* Sayre Decl., Ex. B at 5, 15.

Jimenez has hepatitis C, genotype 1b. He was diagnosed in or about 2004 at California State Prison - Solano. *See* Amended Complaint, p. 1. A liver biopsy was done and he was diagnosed in June 2007 as having grade 3-4 hepatitis C.

Jimenez began therapy for his hepatitis C on July 19, 2007, apparently at California State

---

[1] Dr. Sayre explained the reference to the "log." "Log is the numerical base in a numbering system. We use a base 10 system. Thus a two-log difference is 10 x 10 or a 100 times factor difference. That means to be greater than a two-log reduction, the drop had to be three decimal places different (3 = 10 x 10 x 10). For example, a drop from 100,000 to 100 would be the required greater-than-two-log drop, as would 1,000,000 to 1,000." Sayre Decl., ¶ 3.

2

Prison - Solano. He was transferred out of that prison on or about May 9, 2008. First, he went to Corcoran State Prison, where he received some therapy and then therapy was stopped in May 2008.[2] It appears from his medical records that Jimenez still had a viral load – indeed, it had increased between October 2007 and February 2008 – and thus he was a non-responder. Sayre Decl., ¶ 4.

Jimenez then was transferred again and arrived at Pelican Bay State Prison on June 10, 2008. He reported that he had hepatitis C and that he was receiving anti-viral therapy. After Jimenez's arrival at Pelican Bay, the hepatitis C committee discussed his case on June 24, 2008.[3] Jimenez's full medical records were not transferred with him; as a result, the hepatitis C committee was unsure of the status of Jimenez's anti-viral therapy. As a precautionary interim measure, the hepatitis C committee recommended that Jimenez receive anti-viral therapy at full dose, and that his labs be watched closely and reviewed in two weeks.

On July 23, 2008, the hepatitis C committee again discussed Jimenez's case and now had his complete medical records. The committee saw that his therapy had been discontinued in May 2008 because he was a non-responder. The committee noted that Jimenez was still a non-responder and that his therapy should be discontinued again.

On July 24, 2008, Dr. Rowe noted that Jimenez's viral note had increased from 177,000 on June 12, 2008 to 232,800 on July 15, 2008, and that the hepatitis C committee had discussed his case on July 23. She wrote that he was "[c]onsidered to be a 'nonresponder,' so AVT was discontinued." Sayre Decl., Ex. A at 14. She determined to continue following the patient at

---

[2] While he was still housed at the prison in Corcoran, Jimenez submitted a health care services request form on May 29, 2008 inquiring about his therapy. The form has a notation of "HCV meds D/C'd per Dr. Wang."Amended Complaint Exs. (docket # 6, p. 13 of 22). Jimenez submitted another health care services request form the next day, and received basically the same response on May 30, when the notation stated that the pegasys and ribavirin had been discontinued on May 30 by Dr. Wang. *Id.* at p. 11 of 22. A separate note to Jimenez stated: "Dr. Wang discontinued your hepatitis C meds. Per Dr. you don't need them anymore. You are finished with the medications. You have an upcoming appointment with him." *Id.*

[3] At Pelican Bay, there is a hepatitis C committee. The hepatitis C committee is comprised of the practicing medical providers – doctors, family nurse practitioners, and physician assistants – at the prison present on the day the committee convenes. The committee discusses treatment plans for inmates with hepatitis C, and whether treatment should be adjusted or discontinued.

3

30 days "until he is stable." *Id.*[4]

On August 29, 2008, Dr. Rowe saw Jimenez for a follow-up. She noted that his viral load had increased during the previous month. The participants agree that it was an unpleasant appointment. Jimenez thought Rowe was "hostile and aggressive" toward him when he questioned whether the gaps in therapy caused him to be a non-responder. Opposition, p. 3; *see also* docket # 31, p. 6 of 21.  Rowe wrote that Jimenez was "[n]ot cooperative and was speaking very negatively and trying to control the visit. When asked if he would cooperate/stop the attitude versus my leaving the room, he said 'BYE.'" Opposition Ex. A-9 (Docket # 39, p. 17).

The three-week interruption in therapy before it was resumed in mid-June at Pelican Bay "would not have affected this outcome," i.e., the increasing viral load. Sayre Decl., ¶ 6.

The hepatitis C committee consulted with liver specialists at the University of California San Francisco ("UCSF") after Jimenez's therapy had been discontinued because he had very advanced liver damage. The UCSF specialists' recommendation was to give anti-viral therapy another try.

On April 13, 2009, therapy was started again for Jimenez. After three months, his viral count had not dropped the required amount and Dr. Imperial, an expert in the field at UCSF, recommended to prison doctors that Jimenez be given one last try with a higher dosage of medication. Jimenez received the higher dose for three months, but his viral count did not decrease. Again he was a non-responder. Therapy was discontinued on or about October 29, 2009, after consultation with UCSF experts.[5] The UCSF experts agreed with the Pelican Bay

---

[4] Although the decision to discontinue the therapy was made on July 23 or 24, 2008, the parties disagree as to whether it was at the July 24 or the August 29 appointment that Dr. Rowe first told Jimenez of the decision to discontinue the anti-viral therapy. The date on which she first told him that therapy was discontinued is not a material fact.

[5] Jimenez points out that there were several inconsistencies or inaccuracies in the notes of the consultation with UCSF. First, his weight was listed as 215, but he didn't weigh more than about 176 pounds. He does not show that this mistake had any consequence. Second, the consultation form stated he "has demonstrated a 2 log drop at week 12," whereas Risenhoover's notes stated that there was only a 1-log drop at week 12. *Compare* Opposition Ex. B-22 *with* Ex. B-24. Although the consultation form stated he had demonstrated the 2-log drop at week 12, the actual numbers listed on the same form showed that he had not. The form states that his viral load went from 2,690,000 (before treatment), to 59,000 (at week 12), to 17,000 (at week 24, on 9/28/09). A 2-log reduction from the viral load of 2,690,000 would be a viral load of less

4

1 hepatitis C committee's decision to discontinue therapy.

2 Dr. Sayre summed up the grim state of affairs: "This last round of therapy was well beyond what is required under the CDCR protocol. It was university-level therapy at the cusp of current treatment, given under the direction of Dr. Imperial and with her follow-up of the results. The best therapy currently available to treat Hepatitis C does not work on Jimenez. There is nothing in our present state of medical knowledge that can cure him of Hepatitis C." Sayre Decl., ¶ 7.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to Jimenez's amended complaint occurred at a prison in Del Norte County, located in the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

than 26,900; therefore, the 59,000 viral load reported at week 12 would not have been the necessary 2-log reduction. In any event, the records are in agreement that Jimenez did not have the necessary viral load reduction at week 24 and are in agreement that therapy should be stopped.

5

(1986).

Generally, as is the situation with defendants' challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, statements of fact in the amended complaint and opposition are considered as evidence for purposes of deciding the motion because both were made under penalty of perjury.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631.

**DISCUSSION**

A.   Eighth Amendment Claim

Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is,

6

subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Accordingly, evaluating a claim of deliberate indifference necessitates examining "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Estelle*, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate health. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he or she must actually draw that inference. *Id.* A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

The evidence in the record shows that Jimenez had stage 3-4 hepatitis C. Defendants do not dispute that this condition presented an objectively serious medical need.

The focus here is on the subjective prong of the Eighth Amendment test, i.e., whether defendants were deliberately indifferent in their response to Jimenez's hepatitis C. Having carefully reviewed the evidence, the court concludes that no reasonable jury could find in Jimenez's favor on his Eighth Amendment claim. Defendants did stop the therapy, but did not act with deliberate indifference in doing so because the patient was not responding to the therapy.

Jimenez has failed to show a triable issue of material fact on his deliberate indifference

7

1 claim. The evidence is undisputed that the prison had a protocol for treating inmates with
2 hepatitis C; that inmates who did not have a specified drop in viral load during therapy were
3 considered nonresponders under that protocol; and that the protocol called for discontinuing
4 therapy for nonresponders. The evidence also is undisputed that therapy had been stopped
5 before Jimenez arrived at Pelican Bay because he was a nonresponder; that therapy was started
6 again on June 24, 2008 as a precautionary measure because Pelican Bay medical staff did not
7 have all of Jimenez's records; that therapy was stopped again on July 24 once the medical staff
8 at Pelican Bay saw the records that showed Jimenez had been determined to be a non-responder
9 and was still a non-responder; that prison medical staff tried two more courses of therapy in 2009
10 after consultation with hepatitis experts at UCSF; and that therapy was stopped for the last time
11 in October 2009 after consultation with the hepatitis experts at UCSF because Jimenez was once
12 again a nonresponder. On this evidence, no reasonable jury could find in Jimenez's favor on his
13 Eighth Amendment claim.

14 Jimenez presents no evidence that he was a responder. And he presents no evidence that
15 it is medically beneficial to continue therapy for hepatitis C when the patient does not respond
16 to that therapy. He may disagree with the decision to stop therapy and wish that medical staff
17 would continue it, but that would be only a difference of opinion as to the proper course of care.
18 A difference of opinion does not establish deliberate indifference by defendants. To survive
19 summary judgment, Jimenez had to – but did not – provide evidence that the course of treatment
20 the medical staff chose was "medically unacceptable under the circumstances" and that the
21 course was chosen "in conscious disregard of an excessive risk" to Jimenez's health. *Jackson*
22 *v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

23 Jimenez believes that he was not responding because of the interruptions in therapy, but
24 he presents no evidence to support his hypothesis. Indeed, the only competent evidence on this
25 point is to the contrary: Dr. Sayre declared that the 3-week gap in treatment made no difference
26 to the outcome. Further, the therapy was not "interrupted" before he arrived at Pelican Bay,
27 but instead was stopped because he was deemed to be a nonresponder. It therefore appears that
28 all of the therapy he received at Pelican Bay was in excess of that to which he was entitled to

8

1 under the protocol. Jimenez is in a difficult situation. But there is no evidence that it is one of
2 prison officials' making.

3 The determination whether a patient was a responder or nonresponder was made by
4 comparing the viral loads to see if there was necessary 2-log reduction in viral load after three
5 months of therapy. Dr. Sayre's explanation of the log reduction is, at the least, confusing. He
6 explained that, in a base 10 system such as the one they used to measure viral load reductions,
7 "a two-log difference is 10 x 10 or a 100 times factor difference. *That means to be greater than*
8 *a two-log reduction, the drop had to be three decimal places different (3 = 10 x 10 x 10). For*
9 *example, a drop from 100,000 to 100 would be the required greater-than-two-log drop, as would*
10 *1,000,000 to 1,000*." Sayre Decl., ¶ 3 (emphasis added). The italicized statements suggest that,
11 to be greater-than-2-log reduction, there had to be at least a 3-log reduction in the viral load
12 number. However, a greater-than-2-log reduction in a number need not be at least a 3-log
13 reduction in that number, and instead can be any number smaller than a "2-log" reduction – e.g.,
14 a greater-than 2-log drop from 100,000 would any number less than 1,000. While the declarant
15 is correct that a drop from 100,000 to 100 would be the required greater-than-2-log drop, so too
16 would a drop from 100,000 to 999 (or any other number lower than 1,000). This math problem
17 does not create a triable issue of fact because there is no evidence to show that Jimenez had the
18 necessary "greater-than-2-log drop" in his viral load. For example, the actual viral load numbers
19 that showed a less than 2-log drop were provided for the decision in October 2009 to stop
20 therapy for the final time, and the original decision to stop therapy for the non-responder was
21 made before he even arrived at Pelican Bay.

22 Defendants have met their burden on summary judgment of showing the absence of
23 evidence that they acted with the deliberate indifference necessary for an Eighth Amendment
24 violation. When the evidence is viewed in the light most favorable to Jimenez, and inferences
25 therefrom drawn in his favor, no reasonable jury could return a verdict for him and against
26 defendants. Defendants therefore are entitled to judgment as a matter of law on the Eighth
27 Amendment claim.
28

9

### B. Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.* If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. *See Pearson v. Callahan*, 553 U.S. 223, 236 (2009).

As discussed in the preceding section, the evidence in the record does not establish a violation of Jimenez's Eighth Amendment rights. Defendants prevail on the first step of the *Saucier* analysis. Even if a constitutional violation had been shown, however, defendants would prevail on the second step of the *Saucier* analysis. With the undisputed evidence being that Jimenez was not responding to the anti-viral therapy that had serious potential side effects, a reasonable official would not have understood that discontinuing the therapy violated that inmate's Eighth Amendment rights. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 24.) Defendants are entitled to judgment as a matter of law on the merits of the Eighth Amendment claims and on their defense of qualified immunity. Judgment will be entered in all defendants' favor and against plaintiff. Plaintiff's motion to compel discovery and request for production of documents are DENIED as moot. (Docket # 33, # 34.) The clerk will close the file.

IT IS SO ORDERED.

Dated: July 25, 2011

_____
SUSAN ILLSTON
United States District Judge